Liza M. Walsh, Esq.
Rukhsanah L. Singh, Esq.
**CONNELL FOLEY LLP**
85 Livingston Avenue
Roseland, New Jersey 07068
Telephone No.:  (973) 535-0500

Juanita R. Brooks, Esq.
**FISH & RICHARDSON P.C.**
12390 El Camino Real
San Diego, California 92130
Telephone No.:  (858) 678-5070

Jonathan E. Singer, Esq.
**FISH & RICHARDSON P.C.**
3200 RBC Plaza, 60 South Sixth Street
Minneapolis, Minnesota 55402
Telephone No.:  (612) 335-5070

W. Chad Shear, Esq.
**FISH & RICHARDSON P.C.**
222 Delaware Avenue
Wilmington, Delaware 19801
Telephone No.:  (302) 652-5070

Irene E. Hudson, Esq.
**FISH & RICHARDSON P.C.**
601 Lexington Avenue
New York, New York 10022
Telephone No.:  (212) 765-5070

*Attorneys for Plaintiffs*
*Roche Palo Alto LLC, Gilead*
*Palo Alto, Inc. and Gilead Sciences, Inc.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| ROCHE PALO ALTO LLC, GILEAD PALO ALTO, INC. and GILEAD SCIENCES, INC., | |
| Plaintiffs, | Civil Action No. 2:10-cv-03561-ES-CLW |
| v. | |
| LUPIN PHARMACEUTICALS, INC. and LUPIN LTD., | REDACTED VERSION |
| Defendants. | |

## DECLARATION OF R. POLK WAGNER, J.D., IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT OF INVALIDITY

I, R. Polk Wagner, J.D., declare as follows:

### A.  Contents of This Declaration

1.    The following document contains my analysis of whether the license agreement dated March 27, 1996 between Syntex (USA) Inc., and CV Therapeutics Inc. constitutes an on-sale bar under 35 U.S.C. § 102(b) to the validity of patents in suit related to ranolazine treatment for angina.

### B.  Qualifications and Experience

2.    I am currently a tenured full professor of law at the University of Pennsylvania Law School, where I teach and conduct research on issues related to intellectual property, focusing especially on patent law.

3.    I am the author of over twenty articles on patent law and other intellectual property issues, as well as co-author of book, PATENT LAW: CONCEPTS AND INSIGHTS (Foundation Press 2008).

4.    I have given several dozens of lectures to audiences in academic settings (for example, Harvard Law School, Stanford Law School, University of Michigan Law School, Columbia Law School, Waseda University [Tokyo, Japan], Shih Hsin University [Taipei, Taiwan], National Law School of India University [Bangalore, India] and many others), national and international industry organizations (for example, BIO, Intellectual Property Owners' Association), national and regional legal organizations (for example, American Intellectual Property Law Association, Association of Corporate Patent Counsel, Houston IP Law Association), federal judges, and the U.S. Patent and Trademark Office.

5.    Before joining the University of Pennsylvania Law School Faculty in 2000, I served as a law clerk to Judge Raymond C. Clevenger III of the United States Court of Appeals for the Federal Circuit.

6.      I attended Stanford Law School, where I graduated order of the coif, I have a degree in engineering from the University of Michigan, and was the 1994-95 Roger M. Jones Fellow at the London School of Economics in London, UK.

7.      I am registered to practice before courts in the state of California and the United States Court of Appeals for the Federal Circuit, and have been admitted to practice before the USPTO since 1997.   Additional information related to my background, training, and experience is included in my curriculum vitae, attached hereto as Exhibit A.

8.      This declaration is based on my expertise, knowledge and experience.   In connection with preparing this declaration I have consulted the declaration of Omri Ben-Shahar in Support of Lupin's Motion; the patents-in-suit; the February 14, 2012 deposition transcript of Andrew Wolf; Plaintiffs' Tabular Listing of All Clinical Studies (GIL-RANEXA00267834-99); and various cases and statutes cited herein.

## II

## ANALYSIS

9.      Section 102(b) of the Patent Act establishes what is known as the "on-sale bar":

***35 U.S.C. 102 Conditions for patentability; novelty and loss of right to patent.***

A person shall be entitled to a patent unless - [ ... ] (b) the invention was ... on sale in this country, more than one year prior to the date of the application for patent in the United States ....

10.     As consistently interpreted by courts, the on-sale bar has two components:  first, there must be a commercial sale (or offer for sale) of the invention; and second, the invention must be "ready for patenting" at the time of the sale (or offer for sale).

11.     For purposes of the analysis, here, I will focus only on the first prong of the on-sale bar analysis: whether the March 27, 1996 agreement between Syntex (USA) Inc., and

CV Therapeutics Inc. (hereafter, "the Agreement") is a sale of the sort that 35 U.S.C. § 102(b) contemplates.

12. As I discuss in detail below, I believe there are two independent reasons that the Agreement does not constitute an on-sale bar with respect to the patents at issue in this case. First, the Agreement is best understood as a transfer of a research project, not a commercial sale of the invention itself. And second, even if the Agreement is a commercial sale of the invention, the primary purpose of the transfer is for experimentation, thus precluding application of the on-sale bar. I take each of these analyses in turn below.

### A. The Ben-Shahar Declaration Does Not Inform the On-Sale Bar Question

13. Counsel has asked me to review the declaration submitted by Professor Omri Ben-Shahar on behalf of Lupin. I have done so, and in my opinion the declaration does not speak to the question of whether the Agreement triggers the on-sale bar of 35 U.S.C. § 102(b). Professor Ben-Shahar opines that under general principles of contract law, the Agreement is a "sale" or "offer to sell" the ranolazine materials referenced in the Agreement. There are two important reasons the Ben-Shahar Declaration fails here.

14. First, while it is clear that under the patent law the UCC and other contract doctrines provides guidance concerning whether a "commercial offer for sale" under 102(b) has occurred, the Federal Circuit has specifically declined to follow any particular law of contracts, reasoning instead that "[T]he body of case law from which we must draw guidance ... is that of the state and federal courts interpreting their individual versions of the UCC. From this body of state law, we will search for the common denominator for assistance in crafting the federal common law of contract that now governs the on-sale bar." *Linear Tech. Corp. v. Micrel, Inc.*, 275 F.3d 1040, 1048 (Fed. Cir. 2001).

15. Further, this "common law of contract that now governs the on-sale bar" is *a creature of Federal Circuit law alone*: "Because of the importance of having a uniform national rule regarding the on-sale bar, we hold that the question of whether an invention is the subject of a commercial offer for sale is a matter of Federal Circuit law." *Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1047 (Fed. Cir. 2001).

16.    Thus, whether the Agreement constitutes a sale or offer to sell ranolazine under the terms of the UCC and/or other jurisdiction is not dispositive of whether the Agreement constitutes a sale or offer to sell ranolazine under 35 U.S.C. § 102(b).

17.    Second (and even more importantly), even if Professor Ben-Shahar's declaration answered a more relevant question—whether the Federal Circuit's version of the "common law of contracts that now governs the on-sale bar" points towards the Agreement being a sale or offer to sell ranolazine—the patent law requires courts to analyze the purpose of such transactions in every instance. *Allen Eng'g Corp. v. Bartell Indus., Inc.,* 299 F.3d 1336, 1352-53 (Fed. Cir. 2002).

18.    As I note in more detail below, the Agreement, when read as a whole, is plainly intended to transfer a research project to facilitate the development of pharmaceuticals rather than to commercialize the ranolazine that Syntex had on hand at the time of the Agreement. In addition, any "sale" or "offer to sell" ranolazine as part of the Agreement was clearly intended for experimentation. For both of these reasons, the Agreement was not an on sale-bar event under 35 U.S.C. § 102(b), irrespective of Professor Ben-Shahar's analysis under the UCC and California contract law.

### B. The Agreement is not a Commercial Sale of the Invention as Required by 35 U.S.C. § 102(b).

19.    The purpose of the on-sale bar is two-fold: first, to prevent the extension of the patent grant; and second, to protect the public's access to knowledge. That is, by limiting the time that a patentee may commercially exploit her invention prior to applying for a patent, the on-sale bar prevents patentees from effectively extending the patent grant by delaying their application while commercializing their invention. Similarly, the on-sale bar protects the public by preventing the removal of knowledge (inventions) via patenting—if those inventions have been made commercially available.

20.    Importantly, the Agreement here does not implicate either of these two animating concerns of the on-sale bar. The purpose of the Agreement was clearly to transfer the *research project*—the exploration and development of ranolazine as a efficacious pharmaceutical treatment for angina—from Syntex to CVT, not to commercialize any then-extant ranolazine materials. Thus, in my opinion, the Agreement is a transaction between Syntex and CVT which does not trigger the on-sale bar of §

102(b): it does not constitute either a sale or an offer for sale of the invention as required by that section.

21.     My assessment is based on my reading of the Agreement as a whole, and in particular the "whereas" clauses, which set forth the purpose of the transaction. ███████████

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████

22.     That is, the Agreement was intended to effectuate a transfer of intellectual property and other know-how from Syntex to CVT, so as to allow the development of pharmaceuticals using the ranolazine compound.  This is not the type of transaction contemplated by the on-sale bar of § 102(b).  The Agreement did not commercialize ranolazine, certainly not in a way that would allow for an effective extension of the patent grant.  Further, the Agreement makes clear that ranolazine materials are not commercially available at the time of the Agreement—indeed the very purpose of the Agreement is to enable the *later* development and (ultimately) the commercialization of ranolazine for treatment of angina.

23.     Perhaps even more important than what the whereas clauses say is what they *do not* say.  They do not even mention the existence of any ranolazine-related materials, much less suggest that a purpose of the transaction was to sell, offer to sell, or otherwise commercialize those materials.  The Agreement's purpose is obviously directed to the transfer of know-how and related patent license rights, not the sale or offer for sale of the invention at issue in this case.

24.     This view of the Agreement is further confirmed by understanding that at the time of the Agreement, Federal law prohibited any commercialization of the then-extant ranolazine materials in a way that would implicate the purposes of the on-sale bar.

That is I understand that at the time of agreement, the FDA had not approved ranolazine for treatment of angina; thus ranolazine could not be legally sold or offered for sale in the United States for the trea [redacted]

25. [redacted]

26.     The relevant case law on what constitutes a sale or offer for sale under 35 U.S.C. § 102(b) is in accord with my analysis, and indeed I believe that a finding that the Agreement here triggered the on-sale bar would be an unwarranted and troubling extension of the law.

27.     In *Pfaff v Wells*, the Supreme Court established the modern rules of the on-sale bar: "[T]he on-sale bar applies when two conditions are satisfied before the critical date. First, the product must be the subject of a commercial offer for sale. An inventor can both understand and control the timing of the first commercial marketing of his invention…. Second, the invention must be ready for patenting." *Pfaff v. Wells*, 525 U.S. 55, 67 (1998).

28.     In *Pfaff*, there was no dispute about the commercial offer for sale component of the test: the inventor had accepted a specific purchase order to supply the invention—so the Court did not explore the contours of commercial offer for sale, except to note that sales that were related to experimentation on the invention were not within the scope of § 102(b).  *See Pfaff*, 525 U.S. at 64-65.

29.     The Federal Circuit, however, has attempted to clarify the scope of the "commercial offer for sale" doctrine.  As a general matter, the Federal Circuit has stated that courts should look to the UCC for understanding the nature of a commercial sale or offer for sale under § 102(b).  However, this clarification has not been very satisfactory, as the Federal Circuit itself has noted —most prominently in *Linear Tech. Corp. v. Micrel, Inc*, 275 F.3d 1040 (Fed. Cir. 2001).  Among other issues, the UCC does not define an offer for sale, so Courts are forced to discern the (federal) common law of contract offers whenever an offer for sale is at issue rather than look to the UCC.  Further, the UCC allows for contract formation even if the timing of such formation is unclear—which is obviously problematic from an on-sale bar perspective.  Indeed, although it is oft-repeated that UCC principles govern the "commercial offer for sale" component of the on-sale bar, the Federal Circuit in *Linear Tech* concluded that in fact the governing contract law is actually specific to the on-sale bar: "the body of case law from which we must draw guidance … is that of the state and federal courts interpreting their individual versions of the UCC. From this . . . we will search for the common

denominator . . . in crafting the federal common law of contract that now governs the on-sale bar." *Linear Tech*, 275 F.3d at 1048.

30.  This "federal common law of contract that governs the on-sale bar" has some important guideposts.  First, following from *Pfaff*, it is clear that a specific purchase order directed to the invention is clearly a "commercial offer for sale."  On the other hand, general but widespread promotional activity such as advertising does not trigger the on-sale bar. *See Linear Tech, 275 F.3d at 1048*. Even the sending of samples of the invention to potential customers has been held to fall short of a triggering offer for sale.  *See Minnesota Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1308 (Fed. Cir. 2002).

31.  Critically for our purposes here, agreements to license patents or potential patents to the invention are not sales or offers under 35 U.S.C. § 102(b). *See Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1267 (Fed. Cir. 1986), cert. denied, 479 U.S. 1030 (1987).  Indeed the Federal Circuit in *Mas-Hamilton Group v Legard, Inc.* did not find a commercial offer for sale in a case quite similar to this one, where: (a) physical embodiments of the invention were offered to a potential licensee; (b) money was exchanged; (c) the devices (locks) were for testing or show only; (d) and the overall purpose of the transaction was to transfer either production rights in the invention, or an the exclusive right to market the invention to the government rather than the devices themselves.

32.  *Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1217 (Fed. Cir. 1998).  And the 9th Circuit (prior to the creation of the Federal Circuit) held that corporate mergers and transactions do not themselves trigger the on-sale bar, even though they may transfer the invention as part of the assets contemplated by the agreement.  *See Micro-Magnetic Industries, Inc. v. Advance Automatic Sales* Co., 488 F.2d 771 (9th Cir. 1973).

33.  The Federal Circuit itself has made clear that a transaction intended to transfer patent rights or facilitate research and development does not trigger the on-sale bar.  In *In re Kollar*, the patent applicant had signed an agreement whose purpose was "conduct[ing] research and development ['R&D'] in the Field [which the Board properly determined includes Kollar's inventive process] ... with a goal to achieving, by the end of 5 R&D years, Celanese approval for a commercial plant in the Field." *In re Kollar*, 286 F.3d 1326, 1330 (Fed. Cir. 2002). The Court ruled that such an agreement did not constitute an on-sale bar. *See id.* at 1333.

34.     To be sure, the courts in these cases have noted that a patent license or know-how transfer that is merely a transfer of the invention itself is indeed a commercial offer for sale under 35 U.S.C. § 102(b).  For example, in *Minton v. Nat'l Ass'n. of Sec. Dealers, Inc.*, 336 F.3d 1373, 1377 (Fed. Cir. 2003), the Court noted that an agreement that transferred rights to use a computer program—styled as a 'lease'—which included both the program itself and a warranty of usability did not avoid the on-sale bar. In contrast, the Agreement at issue here is plainly intended to transfer a research and development project, with associated patent rights and know-how, rather than a transfer of the invention itself.  Thus it is much more factually analogous to cases such as *Mas-Hamilton*, *Kollar* and *Micro-Magnetic Industries* than to simple transfers of the invention such as the purchase orders in *Pfaff* or the software lease at issue in *Minton*. Thus, I believe my analysis above—that the Agreement does not trigger the on-sale bar—is fully supported by current Federal Circuit law.

35.     Indeed, I believe that a holding that the Agreement here was a commercial sale or offer for sale under 35 § U.S.C. § 102(b) would be a troubling extension of the law— undermining the principle from *Pfaff* that the invention must be actually commercialized in order to trigger the on sale bar.  Allowing agreements whose purpose was to transfer research efforts to trigger the on-sale bar would create strong disincentives for such transfers—the loss of potential patent rights could undermine the entire purpose of the transaction.  In addition, such a holding would call into question whether corporate mergers or sales, the formation of joint ventures, or other types of transactions not directly intended to commercialize inventions could nonetheless trigger the on-sale bar (and thus preclude important patent rights) by virtue of the transfer of assets that occurs in such circumstances.  Indeed, in *Pfaff*, the Supreme Court noted that the on-sale bar (like all of patent law) involves a careful balance: "The patent laws therefore seek both to protect the public's right to retain knowledge already in the public domain and the inventor's right to control whether and when he may patent his invention." *Pfaff v. Wells Electronics, Inc.,* 525 U.S. 55, 65 (1998).

36.     In my opinion, the Agreement between Syntex and CVT is not a commercialization of the inventions at issue, and thus does not trigger the prohibitions of 35 U.S.C. § 102(b).

### C. Any Sales of the Invention as part of the Agreement are Primarily Intended for Experimentation and thus do not Trigger the On-Sale Bar.

37.  Even if the Agreement is understood to be a commercialization of the inventions at issue under 35 U.S.C. § 102(b), the purpose of the transfer of the materials as part of the Agreement is primarily for purposes of experimentation, and thus does not trigger the on-sale bar.  As the Supreme Court noted in *Pfaff*, "an inventor who seeks to perfect his discovery may conduct extensive testing without losing his right to obtain a patent for his invention—even if such testing occurs in the public eye. The law has long recognized the distinction between inventions put to experimental use and products sold commercially." *See* 525 U.S. 55, 64, (1998). *See also Elizabeth v. American Nicholson Pavement Co.*, 97 U.S. 126, 137 (1877).  Thus, as the Federal Circuit has held, any consideration of whether a transaction triggers the on-sale bar must "involve[] an assessment of whether the circumstances surrounding the transaction show that the transaction was not primarily for purposes of experimentation." *Allen Eng'g Corp. v. Bartell Indus., Inc.,* 299 F.3d 1336, 1352-53 (Fed. Cir. 2002).

39.     Milestones associated with the Agreement ████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
████████████████████████████████████

40.     My analysis of the experimental nature of the transactions established by the
        Agreement is confirmed by the testimony of a named inventor to the relevant patents
        himself, Dr. Andrew Wolff, who has testified that ████████████████████████
        ████████████████████████████████████████████████████████████
        ████████████████████████████████████████████████████████████
        ████████████████████████████████████████████████████████████
        ████████████████████████████████████████████████████████████
        ████████████████████████████████████████████

41.     ████████████████████████████████████████████████████████████
        ████████████████████████████████████████████████████████████
        ████████████████████████████████████████████████████████████
        ████████████████████████████████████████████████████████████
        ████████████████████████████████████████████████████████████
        ████████████████████████████████████████████████████████████
        ████████████████████████████████████████████████████████████
        ████████████████████████████████████████████████████████████

        *See also In re Omeprazole Patent Litig*
        to pharmaceutical formulation were not reduced to practice prior to Phase III clinical
        trials because the inventors did not know the invention would work for its intended
        purpose).

42.     Under the law, these facts — ████████████████████████████████████
        ████████████████████████████████████████████████████████████
        ████████████████████████████████████████████████████████████
        ████████████████████████████████████████████████████████████
        ████████████████████████████████████████████████████████████
        ██████████████████████████████████████ preclude the application of
                                                entor who seeks to perfect
        his discovery may conduct extensive testing without losing his right to obtain a patent

for his invention—even if such testing occurs in the public eye. The law has long recognized the distinction between inventions put to experimental use and products sold commercially. Experimentation evidence includes tests needed to convince [the inventor] that the invention is capable of performing its intended purpose in its intended environment." *EZ Dock v. Schafer Sys., Inc.*, 276 F.3d 1347, 1352 (Fed. Cir. 2002) (citations and quotations omitted).

43.  Further, the Federal Circuit has held that until an invention is reduced to practice, "up to that point, regardless of the stage of development of the invention, and quite apart from the possible satisfaction of the second prong of the *Pfaff* test, the inventor is free to experiment, test, and otherwise engage in activities to determine if the invention is suitable for its intended purpose and thus satisfactorily complete." *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1354 (Fed. Cir. 2002) (quoting *EZ Dock*, 276 F.3d at 1356-57 (Linn, J., concurring)).

44.  ██████████████████████████████████████████
     ██████████████████████████████████████████
     ██████████████████████████████████████████
     ██████████████████████████████████████████
     ████████████████

## III

## CONCLUSION

45.  For the reasons stated above, I believe that the Agreement dated March 27, 1996 between Syntex (USA) Inc., and CV Therapeutics Inc. does not create an on-sale bar under 35 U.S.C. § 102(b) for the patents at issue in this litigation.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  November 9, 2012          _____
                                  R. Polk Wagner, J.D.

# Exhibit A

# R. POLK WAGNER

PROFESSOR OF LAW
UNIVERSITY OF PENNSYLVANIA LAW SCHOOL
3501 SANSOM STREET
PHILADELPHIA, PA 19104-6204

*polk@law.upenn.edu*
*www.polkwagner.com/*
*267.433.4431*

*05.2012*

**CURRENT**

UNIVERSITY OF PENNSYLVANIA LAW SCHOOL
PROFESSOR, 2005 –
ASSISTANT PROFESSOR, 2000 – 2005
  *Robert A. Gorman Award for Excellence in Teaching, 2006*

**EDUCATION**

STANFORD LAW SCHOOL
JURIS DOCTOR, JUNE 1998
  *Order of the Coif*

LONDON SCHOOL OF ECONOMICS
ROGER M. JONES FELLOW, 1994 – 1995

UNIVERSITY OF MICHIGAN
B.S.E, NAVAL ARCHITECTURE & MARINE ENGINEERING, DECEMBER 1993
  *Summa Cum Laude*

COLLEGE OF CHARLESTON
B.S., PHYSICS, DECEMBER 1993 (3-2 ENGINEERING PROGRAM)
  *Magna Cum Laude*

**PUBLICATIONS**

*Poisoning the Next Apple: How the America Invents Act Harms Inventors*
65 STAN. L. REV. _ *(forthcoming* 2012) (with D. Abrams)

*Did Phillips Change Anything? Empirical Analysis of the Federal*
*Circuit's Claim Construction Doctrine*
*In* INTELLECTUAL PROPERTY AND THE COMMON LAW (S. BALGANESH, ED.)
*(forthcoming* 2012) (with L. Petherbridge)

*Life After Bilski*
63 STAN L. REV. 1315 (2011) (with M. Lemley, M. Risch, T. Sichelman)

*The Two Federal Circuits*
43 LOYOLA L. REV. 785 (2010)

*Understanding Patent Quality Mechanisms*
157 U. PENN L. REV. 1410 (2009)

    *related publication:*
    *Patent Quality Issues in the U.S. and Japan*

## R. POLK WAGNER
PAGE 2 OF 11.

78 CHIZAIKEN FORUM 1 (WINTER 2009) *(in Japanese)*

PATENT LAW: CONCEPTS & INSIGHTS
FOUNDATION PRESS 2008 (with C. Nard).

*The Federal Circuit and Patentability: An Empirical Assessment of the Law of Obviousness*
85 TEX. L. REV 2051 (2007) (with L. Petherbridge)

*Patenting adverse event information: A commentary from the patent law*
PHARMACOEPIDEMIOLOGY & DRUG SAFETY; 15: 396-97 (2006).

*The Perfect Storm: Intellectual Property and Public Values*
72 FORD. L. REV. 423 (2005).

*Reconsidering the DMCA*
42 HOU. L. REV. 1107 (2005).

*Patent Portfolios*
154 U. PENN. L. REV. 1 (2005) (with G. Parchomovsky)

*On Software Regulation*
78 S. CAL. L. REV. 457 (2005).

*Exactly Backwards: A Comment on Technological Exceptionalism in the Patent Law*
54 CASE W. RES. L. REV. 749 (2004).

*Is the Federal Circuit Succeeding? An Empirical Assessment of Judicial Performance*
152 U. PENN. L. REV 1105 (2004) (with L. Petherbridge).

*Of Patents and Path Dependency: A Comment on Burk & Lemley*
18 BERKELEY TECH. L. J. 1341 (2004).

*(Mostly) Against Exceptionalism*
IN F. SCOTT KIEFF, ADVANCES IN GENETICS 50:367 (2003).

*Information Wants to Be Free: Intellectual Property and the Mythologies of Control*
103 COLUM. L. REV. 995 (2003).

*Reconsidering Estoppel: Patent Administration & the Failure of* Festo
151 U. PENN. L. REV. 159 (2002).

*Realspace Sovereigns in Cyberspace: Problems with the ACPA*
17 BERKELEY TECH. L. J. 989 (2002) (with C. Struve)

*The Myth of Private Ordering: Rediscovering Legal Realism in Cyberspace*
73 CHI-KENT L. REV. 1295 (1999) (with Margaret Jane Radin).

*Filters and the First Amendment*
83 MINN. L. REV. 755 (1999).

*The Medium is the Mistake: The Law of Software for the First Amendment*
51 STAN. L. REV. 387 (1999) (student note).

**BRIEFS**

*Brief Amicus Curiae 20 Law and Business Professors in Support of Neither Party, in Bilski v. Doll, No. 08-964 (USSC July 23, 2009)*

*Brief of Amicus Curiae of 22 Law and Business Professors in Support of Appellants, in In re Bernard L. Bilski and Rand A. Warsaw, No. 2007-1130 (Fed. Cir. April 7, 2008).*

*Brief of Business and Law Professors as Amici Curiae in Support of Respondents, in KSR Int'l v. TeleFlex, Inc., No. 04-1350 (USSC October 16, 2006).*

*Amicus Brief of Various Law & Economics Professors as Amicus Curiae in favor of Respondent, in eBay v. MercExchange, No. 05-130 (USSC May 15, 2006).*

*Amicus Brief of Patent Law Professors, in Phillips v. AWH Corp., No. 03-1269 (Fed. Cir. 2004) (en banc).*

**SHORT WORKS**

*The Supreme Court and the Future of Patent Reform*
55 FEDERAL LAWYER 35 (Feb. 2008)

*"A Teaching, Suggestion, or Motivation to Combine": Bringing Structure and Clarity to the Obviousness Analysis*
155 U. PENN. L. REV. PENNUMBRA 96 (2006)

*Comments on "Stealth Marketing and Editorial Integrity"*
85 TEXAS L. REV. SEE ALSO 17 (2006)

**WORKS IN PROGRESS**

*Unenforceable Patents*
      with L. Petherbridge, J. Rantanen

THE OBVIOUSNESS PROJECT (www.obviousness.com/)
      Ongoing research project.

THE CLAIM CONSTRUCTION PROJECT (www.claimconstruction.com/)
      Ongoing research project.

R. POLK WAGNER
PAGE 4 OF 11.

# R. POLK WAGNER
PAGE 5 OF 11.

PRESENTATIONS
*An Economic Research Agenda for the USPTO*
USPTO CONFERENCE ON ECONOMIC RESEARCH
UNITED STATES PATENT AND TRADEMARK OFFICE
ALEXANDRIA, VIRGINIA (DECEMBER 2010)

*Keynote: A Patent Commercialization Requirement*
2010 SHIH HSIN INTERNATIONAL SYMPOSIUM ON INTELLECTUAL PROPERTY
LAW-GOVERNANCE OF NEW TECHNOLOGY: PATENT, COMMERCIALIZATION, AND COMPETITION
SHIH HSIN UNIVERSITY, TAIPEI, TAIWAN (NOVEMBER 2010)

*Life After Bilski*
TAIWAN PATENT OFFICE (TIPO)
TAIPEI, TAIWAN (NOVEMBER 2010)

*Life After Bilski*
TAIWAN NATIONAL INTELLECTUAL PROPERTY COURT
TAIPEI, TAIWAN (NOVEMBER 2010)

*Did Phillips Change Anything? Empirical Analysis of the Federal
Circuit's Claim Construction Doctrine*
TAIWAN NATIONAL INTELLECTUAL PROPERTY COURT
TAIPEI, TAIWAN (NOVEMBER 2010)

Patent Claim Scope and the Notice Function of Claims
PATENT SCOPE REVISITED: MERGES & NELSON'S ON THE COMPLEX
ECONOMICS OF PATENT SCOPE 20 YEARS LATER
INDIANA UNIVERSITY, MAURER SCHOOL OF LAW
BLOOMINGTON, INDIANA (SEPTEMBER 2010)

*Did Phillips Change Anything? Empirical Analysis of the Federal
Circuit's Claim Construction Doctrine*
OREGON PATENT LAW ASSOCIATION, PORTLAND, OR (APRIL 2010)

*The Two Federal Circuits*
LOYOLA LAW SCHOOL, LOS ANGELES, CA (OCTOBER 2009)

*A Patent Commercialization Requirement*
2009 IP SCHOLARS CONFERENCE
CARDOZO LAW SCHOOL, NEW YORK, NEW YORK (AUGUST 2009)

*Patent Portfolios & Patent Quality*
FTC HEARINGS ON NEW IP MARKETPLACE
FEDERAL TRADE COMMISSION, WASHINGTON, DC (APRIL 2009)

# R. POLK WAGNER
PAGE 6 OF 11.

*Did Phillips Change Anything? Empirical Analysis of the Federal Circuit's Claim Construction Doctrine*
YALE LAW SCHOOL
NEW HAVEN, CT (APRIL 2009)

*Understanding Patent Quality Mechanisms*
JOHN MARSHALL LAW SCHOOL
CHICAGO, IL (MARCH 2009)

*Patent Portfolios & Patent Valuation*
UNIVERSITY OF CALIFORNIA, BERKELEY SCHOOL OF LAW, BERKELEY, CA
(FEBRUARY 2009)

*Understanding Patent Quality Mechanisms*
UNIVERSITY OF PENNSYLVANIA LAW SCHOOL
PHILADELPHIA, PA (JANUARY 2009)

*Understanding Patent Quality Mechanisms*
INSTITUTE FOR INTELLECTUAL PROPERTY
TOKYO, JAPAN (NOVEMBER 2008)

*Recent US Supreme Court IP Cases*
TAIWAN NATIONAL UNIVERSITY (LAW SCHOOL)
TAIPEI, TAIWAN (OCTOBER 2008)

*Did Phillips Change Anything? Empirical Analysis of the Federal Circuit's Claim Construction Doctrine*
AIPLA SPRING MEETING 2008
HOUSTON, TX (MAY 2008)

*Did Phillips Change Anything? Empirical Analysis of the Federal Circuit's Claim Construction Doctrine*
CHICAGO-KENT COLLEGE OF LAW
CHICAGO, IL (APRIL 2008)

*KSR, The Supreme Court and The Future Of Patent Reform*
LEWIS & CLARK LAW SCHOOL
PORTLAND, OR (OCTOBER 2007)

*Did Phillips Change Anything? Empirical Analysis of the Federal Circuit's Claim Construction*
BENJAMIN M. CARDOZO LAW SCHOOL
NEW YORK, NY (OCTOBER 2007)

*Did Phillips Change Anything? Empirical Analysis of the Federal Circuit's Claim Construction*
THE 2007 INTELLECTUAL PROPERTY SCHOLARS CONFERENCE
CHICAGO, IL (AUGUST 2007)

*Intellectual Property in Technology Transfer*
SALZBURG SEMINAR (SESSION 441)
SALZBURG, AUSTRIA (APRIL 2007)

# R. POLK WAGNER
PAGE 7 OF 11.

*Getting Past Patent Trolls: Patent Enforcement in the 21st Century*
WASEDA UNIVERSITY, TOKYO, JAPAN (MARCH 2007)

*The U.S. Law of Patentability: Theory, Law & Evidence*
WASEDA UNIVERSITY, TOKYO, JAPAN (MARCH 2007)

*Did Phillips Change Anything? Empirical Analysis of the Federal Circuit's Claim Construction*
TOKYO MEDICAL & DENTAL UNIVERSITY, TOKYO, JAPAN (MARCH 2007)

*Getting Past Patent Trolls: Patent Enforcement in the 21st Century*
THE OHIO STATE UNIVERSITY, COLUMBUS, OH (FEBRUARY 2007)

*The Federal Circuit and Patentability: An Empirical Assessment of the Law of Obviousness*
RUTGERS-CAMDEN LAW SCHOOL, CAMDEN, NJ (FEBRUARY 2007)

*The Federal Circuit and Patentability: An Empirical Assessment of the Law of Obviousness*
UNIVERSITY OF TEXAS LAW SCHOOL, AUSTIN, TX (NOVEMBER 2006)

*The Federal Circuit and Patentability: An Empirical Assessment of the Law of Obviousness*
PHILADELPHIA-AREA COLLOQUIUM, PHILADELPHIA, PA (OCTOBER 2006)

*Did Phillips Change Anything? Empirical Analysis of the Federal Circuit's Claim Construction*
SANTA CLARA LAW SCHOOL, SANTA CLARA, CA (OCTOBER 2006).

*Unfree Culture? (A Debate with Larry Lessig for the Penn Reading Project)*
UNIVERSITY OF PENNSYLVANIA, PHILADELPHIA, PA (SEPTEMBER 2006) .

*The Patent Quality Index Project*
ROHM & HAAS, INC., PHILADELPHIA, PA (JUNE 2006).

*Innovation and Access in Open-Source Pharmaceuticals*
TEMPLE LAW SCHOOL, PHILADELPHIA, PA (FEBRUARY 2006).

*The Patent Quality Index Project*
US PATENT AND TRADEMARK OFFICE, ALEXANDRIA, VA (DECEMBER 2005).

*Claim Construction at the Federal Circuit: An Update*
BAR ASSOCIATION OF PHILADELPHIA, PHILADELPHIA, PA (DECEMBER 2005)

*The Federal Circuit's Innovation Policy*
COMMERCIALIZING INNOVATION CONFERENCE, WASHINGTON UNIVERSITY, ST. LOUIS, MO (NOV. 2005)

*Predicting the Federal Circuit: The Example of Claim Construction*
HOUSTON INTELLECTUAL PROPERTY LAW ASSOCIATION (HIPLA) ANNUAL CONFERENCE, HOUSTON, TX (OCT. 2005)

*Is the Federal Circuit Succeeding?*
2005 INTELLECTUAL PROPERTY OWNERS' (IPO) ANNUAL MEETING, SEATTLE,
WA (SEPT. 2005)

*Is the Federal Circuit Succeeding?*
BIO 2005, PHILADELPHIA, PA (JUNE 2005)

*Reconsidering the DMCA*
2005 IPIL/HOUSTON SANTA FE CONFERENCE, SANTA FE, NM (JUNE 2005)

*The Perfect Storm: Intellectual Property and Public Values*
FORDHAM LAW SCHOOL INFORMATION SOCIETY CONFERENCE
NEW YORK, NY (APRIL 2005)

*Is the Federal Circuit Succeeding? An Empirical Assessment of Judicial Performance*
ASSOCIATION OF CORPORATE PATENT COUNSEL WINTER MEETING
MIAMI, FLORIDA (FEBRUARY 2005)

*Decision-Making at the Federal Circuit: An Empirical Analysis and Update*
AMERICAN INTELLECTUAL PROPERTY LAW ASSOCIATION ANNUAL MEETING
WASHINGTON, DC (OCTOBER 2004)

*Patent Portfolios*
UNIVERSITY OF CALIFORNIA, BERKELEY (BOALT HALL)
BERKELEY, CA (OCTOBER 2004)

*Patent Portfolios*
2004 INTELLECTUAL PROPERTY SCHOLARS CONFERENCE
LOYOLA UNIVERSITY LAW SCHOOL
CHICAGO, IL (AUGUST 2004)

*Patent Portfolios*
UNIVERSITY OF PENNSYLVANIA LAW SCHOOL
PHILADELPHIA, PA (JULY 2004)

*A Perfect Storm: Fair Use in the Modern Scholarly Domain*
ANNENBERG SCHOOL FOR COMMUNICATIONS (U. OF PENNSYLVANIA)
PHILADELPHIA, PA (JUNE 2004).

*Is the Federal Circuit Succeeding? An Empirical Assessment of Judicial Performance*
UNIVERSITY OF VIRGINIA LAW SCHOOL
CHARLOTTESVILLE, VA (APRIL 2004)

*Information Wants to Be Free: Intellectual Property and the Mythologies of Control*
NEW YORK UNIVERSITY LAW SCHOOL
NEW YORK, NY (JANUARY 2004)

*Is the Federal Circuit Succeeding? An Empirical Assessment of Judicial Performance.*
FISH & RICHARDSON SEMINAR SERIES
WILMINGTON, DE (DECEMBER 2003) (BROADCAST)

R. POLK WAGNER
PAGE 9 OF 11.

*Exactly Backwards: A Comment on Technological Exceptionalism in the Patent Law*
THE PAST, PRESENT & FUTURE OF THE FEDERAL CIRCUIT
CASE WESTERN RESERVE UNIVERSITY LAW SCHOOL
CLEVELAND, OH (NOVEMBER 2003)

*The Case Against Software*
THE PENN-TEMPLE-WHARTON COLLOQUIUM
PHILADELPHIA, PA  (NOVEMBER 2003)

*Is the Federal Circuit Succeeding? An Empirical Assessment of Judicial Performance*
FEDERALIST SOCIETY, INTELLECTUAL PROPERTY SECTION
NEW YORK, NY (OCTOBER 2003)

*Plate Tectonics: Copyright vs. the First Amendment*
CONSTITUTIONAL LAW CONCLAVE 2003
PHILADELPHIA, PA (OCTOBER 2003)

*Current Issues in Cyberlaw & Intellectual Property*
JUDGES' RETREAT, US DISTRICT COURT, EASTERN DISTRICT OF PENNSYLVANIA
ST. MICHAEL'S, MD (OCTOBER 2003)

*Is the Federal Circuit Succeeding? An Empirical Look at Claim Construction*
AMERICAN LAW & ECONOMICS ASSOCIATION
TORONTO, CANADA (SEPTEMBER 2003)

*The Case Against Software*
THE INTELLECTUAL PROPERTY SCHOLARS CONFERENCE
BERKELEY, CA (AUGUST 2003)

*Biotechnological Patent Law: A Troubling Trend*
BIO 2003 CONFERENCE
WASHINGTON, DC (JULY 2003)

*Standardizing the (Online) Legal Infrastructure*
WHARTON E-BUSINESS CONFERENCE 2003
PHILADELPHIA, PA  (APRIL 2003)

*Is the Federal Circuit Succeeding? An Empirical Look at Claim Construction*
THE GEORGE WASHINGTON UNIVERSITY INTELLECTUAL PROPERTY SPEAKERS' SERIES,
WASHINGTON, D.C. (MARCH 2003)

*Information Wants to Be Free: Intellectual Property and the Mythologies of Control*
THE UNIVERSITY OF MICHIGAN LAW SCHOOL INTELLECTUAL PROPERTY WORKSHOP SERIES,
ANN ARBOR, MICHIGAN (FEBRUARY 2003)

*Cyberproperty*
THE STANFORD LAW SCHOOL INTELLECTUAL PROPERTY WORKSHOP SERIES, STANFORD,
CALIFORNIA (JANUARY 2003)

## R. POLK WAGNER
PAGE 10 OF 11.

*Information Wants to Be Free: Intellectual Property and the Mythologies of Control*
THE 2003 WHARTON LEGAL STUDIES COLLOQUIUM, PHILADELPHIA, PENNSYLVANIA
(NOVEMBER 2002)

*Privacy in the Networked Digital Age*
THE 2002 LAVENDER LAW CONFERENCE, PHILADELPHIA, PENNSYLVANIA (OCTOBER
2002)

*Information Wants to Be Free: Intellectual Property and the Mythologies of Control*
THE 30TH RESEARCH CONFERENCE ON COMMUNICATION, INFORMATION AND INTERNET
POLICY (TPRC), ALEXANDRIA, VIRGINIA (SEPTEMBER 2002)

*(Mostly) Against Exceptionalism*
THE INTELLECTUAL PROPERTY COLLOQUIUM, THE WASHINGTON UNIVERSITY
CONFERENCE SERIES ON LAW & THE HUMAN GENOME PROJECT, ST. LOUIS,
MISSOURI (APRIL 2002)

*Realspace Sovereigns in Cyberspace: The Case of Domain Names*
THE 29TH RESEARCH CONFERENCE ON COMMUNICATION, INFORMATION AND INTERNET
POLICY (TPRC), ALEXANDRIA, VIRGINIA (SEPTEMBER 2001)

*The Challenges of Online Music*
NAPSTER & BEYOND: PROTECTING COPYRIGHT IN THE DIGITAL MILLENNIUM, TEMPLE
UNIVERSITY (APRIL 2001)

*Filtering the 'Net: A Governmental Role*
THE UNIVERSITY OF PENNSYLVANIA LAW SCHOOL-WHARTON SEMINAR
SERIES ON ECOMMERCE REGULATION, PHILADELPHIA, PENNSYLVANIA
(OCTOBER 2000)

TEACHING

INTRODUCTION TO INTELLECTUAL PROPERTY LAW & POLICY (1L ELECTIVE)
Spring 2007, Spring 2006, Spring 2005, Spring 2004, Spring 2003

PATENT LAW
Fall 2011, Fall 2010, Fall 2009, Spring 2008, Spring 2007, Spring 2006, Spring 2005, Spring
2004, Spring 2003, Spring 2002, Spring 2001

PROPERTY LAW
Fall 2011, Fall 2010, Fall 2009, Spring 2009

GILES S. RICH INTELLECTUAL PROPERTY MOOT COURT
AY, 2011-12, AY 2010-11, AY 2009-10, AY 2007-08, AY 2006-07, AY 2005-06, AY 2004-05,
AY 2002-03

ELECTRONIC COMMERCE
Fall 2001, Fall 2000

# R. POLK WAGNER
### PAGE 11 OF 11.

ADVANCED PATENT LAW (SEMINAR)
Fall 2006

ADVANCED TOPICS IN INTELLECTUAL PROPERTY (SEMINAR)
Fall 2005, Fall 2004

ADVANCED INTELLECTUAL PROPERTY: THE FUTURE OF IDEAS (SEMINAR)
Fall 2002

STRATEGIC INTELLECTUAL PROPERTY (SEMINAR)
Spring 2002

| | |
|---|---|
| INSTITUTIONAL SERVICE | FACULTY APPOINTMENTS COMMITTEE<br>Chair (Entry & Lateral): 2009-10, Chair (Entry-Level): 2007-08, Member: 2005-06<br><br>BUILDING COMMITTEE<br>Chair: 2011-12; Chair: 2010-11; Member: 2009-2010<br><br>EDUCATIONAL PROGRAMS COMMITTEE<br>Member: 2009<br><br>CURRICULAR REFORM COMMITTEE<br>Member: 2009<br><br>ADMISSIONS COMMITTEE<br>Chair, 2006-07; Member: 2002-03, 2001-02<br><br>TECHNOLOGY COMMITTEE<br>Member: 2010-11, 2006-07, 2004-05, 2003-04, 2001-02, 2000-01<br><br>SEARCH COMMITTEE FOR DEAN OF ADMISSIONS<br>2006-07, 2002-03<br><br>CONFLICT OF INTEREST STANDING COMMITTEE (CISC) *(University-Wide)*<br>Vice-Chair: 2008–; Member: 2002–<br><br>CENTER FOR TECHNOLOGY TRANSFER GOVERNING BOARD *(University-Wide)*<br>Member: 2006–<br><br>PROVOST'S COUNCIL ON RESEARCH *(University-Wide)*<br>Member: 2010-11, 2009-10, 2008-09; 2007-08, 2006-07, 2005-06, 2004-05<br><br>LEVY SCHOLARS PROGRAM<br>Advisor: 2003-04<br><br>UNIVERSITY COMMUNICATIONS COMMITTEE *(University-Wide)*<br>Member: 2003-04, 2002-03 |

## R. POLK WAGNER
PAGE 12 OF 11.

AD HOC SEMINAR SERIES
  Organizer: Summer 2004, 2003-2004 (with D. Skeel), 2002-03, Summer 2002 (with M. Knoll)

WILSON FELLOWS IN HIGH-TECHNOLOGY
  Advisor/Organizer: 2002-03 *(Weekly seminars & advisory functions)*

PHILADELPHIA AREA 'CYBERLUNCH' DISCUSSION GROUP
  Organizer: 2004-05, 2003-04, 2002-03, 2001-02

UNIVERSITY OF PENNSYLVANIA CENTER FOR TECHNOLOGY TRANSFER
  Board of Advisors: 2004-05, 2003-04, 2002-03, 2001-02

INSTITUTE FOR STRATEGIC THREAT AND RESPONSE (ISTAR) *(Penn institute)*
  Affiliate: 2003-04, 2002-03, 2001-02

INSTITUTE FOR LAW & ECONOMICS WORKSHOP SERIES
  Organizer: 2001-02 (with M. Knoll)

SEARCH COMMITTEE FOR DIRECTOR OF INFORMATION TECHNOLOGY
  2000-01

PENN INTELLECTUAL PROPERTY INTEREST GROUP
  Advisor: 2007-08, 2004-05, 2003-04, 2002-03, 2001-02

**OTHER EMPLOYMENT**

HONORABLE RAYMOND C. CLEVENGER, III
U.S. COURT OF APPEALS FOR THE FEDERAL CIRCUIT
LAW CLERK, 1998 – 2000

WEIL, GOTSHAL & MANGES, LLP — SILICON VALLEY OFFICE
SUMMER ASSOCIATE, MAY – AUGUST 1997

D'ALESSANDRO & RITCHIE, LLP
SUMMER ASSOCIATE, MAY – AUGUST 1996

DIVISION OF STUDENT AFFAIRS, UNIVERSITY OF MICHIGAN
POLICY DEVELOPMENT, SPRING 1994

MARINE HYDRODYNAMICS LAB, UNIVERSITY OF MICHIGAN
STUDENT RESEARCHER, SUMMER 1993

**PROFESSIONAL MEMBERSHIPS**

ADMITTED TO PRACTICE IN THE STATE OF CALIFORNIA
ADMITTED TO PRACTICE BEFORE THE U.S. PATENT AND TRADEMARK OFFICE
ADMITTED TO PRACTICE BEFORE THE US COURT OF APPEALS FOR THE FEDERAL CIRCUIT
UNITED STATES SAILING ASSOCIATION

**EXHIBITS B-D TO**

**DECLARATION OF R. POLK WAGNER, J.D.**

**REDACTED IN THEIR ENTIRETY**